UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATRICK KOLPACKE,

       Plaintiff,                                    Case No.  12-13405

v.                                                Paul D. Borman
                                                         United States District Court

MOORE SALES CORPORATION,

       Defendant.
_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Dkt. No. 26)**

This case arises from a splintered business relationship between Plaintiff Patrick Kolpacke ("Plaintiff") and Defendant Moore Sales Corporation ("Defendant").  Plaintiff alleges that he is owed bonus compensation and Defendant breached its agreement by failing to pay. Plaintiff originally filed his Complaint on October 31, 2012.  (Dkt. No. 1). The parties agreed by stipulation to allow Plaintiff to file an Amended Complaint on January 8, 2013.  (Dkt. No. 14).

Now before the Court is Defendant's Motion for Summary Judgment filed on April 29, 2013.  (Dkt. No. 26).  Plaintiff responded on May 31, 2013 and Defendant filed its reply thereafter.  (Dkt. No. 32 & 33).  A hearing on this matter was held on November 6, 2013.

For the following reasons, the Court GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment.

**I. BACKGROUND**

Defendant is an Indiana corporation with its principal place of business in Vincennes, Indiana.  (Compl. ¶ 2).  It represents manufacturers (known as principals) in the heating,

ventilation and air condition industry ("HVAC"). (Def.'s Br., Moore Dep. at 8, 15). Leondis Moore ("Moore") started the company in 2002. (Moore Decl. ¶ 1). Defendant currently employs seven sales representatives who each cover a certain territory to service and sell the principal's HVAC products. (Moore Decl. ¶ 4).

**A.     Initial Agreement**

On January 12, 2009, Plaintiff, a resident of Ferndale, Michigan, and Moore met for an initial three hour interview. (Def.'s Br., Kolpacke Dep. 35; Compl. ¶ 1). During the interview they discussed the potential sales territory Plaintiff would cover and reviewed a document that set forth the bonus structure. (*Id*. at 36; Kolpacke Dep. Ex. 3, "Bonus Structure" document).[1] Plaintiff testified that he asked Moore if the "bonus schedule capped out at $4 million and he indicated that no, it did not." (Kolpacke Dep. 37:8-10). Moore, however, did not indicate the rate the bonus amount increased. (*Id*. 37). Kolpacke testified that he and Moore did not discuss, nor did Kolpacke ask what was meant by the language on the Bonus Structure document which stated: "Bonus on sales increase over existing business in territory assigned of 2006". (*Id*. 38-39).

On January 16, 2009, Kolpacke received a copy of the Bonus Structure that he and Moore had reviewed during the initial interview and a salary proposal from Moore.[2]  (Ex. 3, Bonus Structure; Ex. 4, 1/16/2009 Email; Kolpacke Dep. 46-47). The Bonus Structure sets forth

---

[1] All exhibits numbers refer to Kolpacke's deposition exhibits attached to Defendant's brief unless otherwise indicated. (Dkt. No. 26).

[2] Plaintiff testified that at the initial interview, the document regarding the bonus structure did not contain any other language regarding an Appendix A, territory or salary as found in Exhibit 3 but did contain the exact bonus language and schedule set forth in Exhibit 3. (Kolpacke Dep. at 39-40).

in relevant part:

|  | Sales | Bonus |
|---|---|---|
| Bonus on Sales Increase | $ 1,000,000 | $ 5,000 |
| Over existing Business in | $ 1,500,000 | $ 5,000 |
| Territory assigned of 2006 | $ 2,000,000 | $ 7,500 |
|  | $ 2,500,000 | $ 11,000 |
|  | $ 3,000,000 | $ 17,000 |
|  | $ 3,500,000 | $ 20,000 |
|  | $ 4,000,000 | $ 27,000 |
| The bonuses continue as sales increase |  | $ 92,500 |

(Ex. 3). The Bonus Structure document also states "Appendix A Territory Includes Part of Michigan, Ohio, W.PA. and WWV." (*Id*.). However, it is undisputed that at that time Plaintiff's territory was to be only the lower peninsula of Michigan. (Kolpacke Dep. 49-50).

 That same day Moore and Kolpacke had a telephone conversation and discussed the employment proposal and Kolpacke took notes on a copy of the Bonus Structure. (Ex. 5, Bonus Structure with Plaintiff's Notes; Kolpacke Dep. 54). In his notes, Kolpacke wrote down the year "2006" but does not recall why he wrote down that year. (Kolpacke Dep. 54-56). Plaintiff also wrote "What is MI territory worth today $". (Ex. 5). Moore testified ultimately that he does not recall whether he gave Plaintiff the 2006 sales numbers from his territory. (Moore Dep. 64-64 (stating he did tell Plaintiff what the 2006 sales numbers were); Moore Dep. 70-71 (stating he did not recall the same)). During the telephone conversation, Plaintiff was offered employment at Moore Sales Corporation and he accepted. (Kolpacke Dep. 60).

 Plaintiff also sent Moore an email later that day confirming employment terms.

(Kolpacke Dep. 54; Ex. 4). The email stated "Bonus schedule as provided for salary increase benchmarks." (Ex. 4). Plaintiff testified that he never proposed a different bonus structure other than the one provided by Moore in the Bonus Structure document. (Kolpacke Dep. 52). Moore also testified that he and Plaintiff did reach an agreement after the initial interview. (Moore Dep. 21-22). It does not appear Moore ever objected to Plaintiff's email confirming terms. Plaintiff's first day of work as an employee for Moore Sales was January 19, 2009.[3] (*Id*.).

**B.    Independent Contractor Status and Sale Representative Agreement**

In approximately August 2009, at the direction of Moore, Plaintiff became an independent contractor. (Kolpacke Dep. 69). It is undisputed that as a result of this change, Plaintiff's annual salary increased from $45,000 to $60,000 and the Bonus Structure remained in place. (Kolpacke Dep. 74-75; Ex. 10, Second Bonus Structure Document ("Second Bonus Document")). Further, Plaintiff's territory increased beyond just Michigan to include northern Ohio, western West Virginia, and the Pittsburgh, Pennsylvania area.[4] (Kolpacke Dep. 70, 78, 80). Although the bonus structure remained unchanged (the language and schedule are identical to the 2009 Bonus Structure) the Second Bonus Document reflected the new salary and also set forth under "Appendix A" the same description of Plaintiff's territory as the previous Bonus Structure document. (Ex. 10). The Second Bonus Document was supplied to Plaintiff sometime between June 26, 2009 and August 2009. (Kolpacke Dep. 74). Also during this same time period, Defendant provided a Sales Representative Agreement ("SRA") to Plaintiff. (Kolpacke

---

[3] In April 2009, Plaintiff's salary increased from $41,000 to $45,000. The Bonus Structure did not change. (Kolpacke Dep. 67).

[4] December 2011, Plaintiff's territory was reduced but his salary stayed the same. (Kolpacke Dep. 135-36; Moore Dep. 62). There is no document that memorializes this change.

4

Dep. at 78-80; Kolpacke Dep. Ex. 11, SRA). Plaintiff signed this SRA and mailed it to Moore's residence as directed. (Kolpacke Dep. at 81-83). It is undisputed that Defendant never signed a copy of the SRA and Plaintiff's signed copy has never been produced. (Kolpacke Dep. 81-82).

**C.     Plaintiff's Sales**

Plaintiff worked for Defendant for approximately three years as an independent contractor. Plaintiff's sales were:

| Year | Sales |
| --- | --- |
| 2009 | $1,888,706.21 |
| 2010 | $1,980,607.45 |
| 2011 | $2,773,488.68 |
| Total: | $6,652,802.34 |

(Pl.'s Br. at 6) (Defendant represents that Plaintiff's sales figure for 2012 are $1,100,357.68. It is unclear if Plaintiff agrees with this figure. (Def.'s Br. at 3)).

**D.     Bonus Structure**

Moore testified that under the Bonus Structure the baseline for calculating a bonus was the 2006 sales figure in Plaintiff's territory, which was $2,800,000. (Moore Dep. 64-65). Because the Bonus Structure set forth that Plaintiff had to achieve a million in sales above the baseline figure ($2,800,000) before triggering a bonus; Plaintiff needed to achieve more than $3,800,000 in sales before qualifying for a bonus. (Moore Dep. ¶ 57). Under Defendant's interpretation Plaintiff never qualified for a bonus because his yearly total was never more than $3,800,000.

Plaintiff agreed that to receive a bonus, pursuant to the Bonus Structure or Second Bonus

Document, he was required to have $1,000,000 over existing sales. (Kolpacke Dep. 91). Plaintiff first testified that he did not recall what the baseline was for existing sales. (*Id*. 91-92). However, Plaintiff then went on to testify that the baseline to calculate his bonus was the 2008 sales figure for his territory. (*Id*. 112). Plaintiff explained that his belief that the baseline is the 2008's sales figure is not based on any written agreement with Defendant, rather, Plaintiff testified that he believes "it would be ridiculous to base my sales on something from 2006." (*Id*. 112-113). Plaintiff states that the sales figure from 2008 was $215,988.80. (*Id*. 131; Pl.'s Ex. O, sales history/summary by principal 10/2008/12/2009). Defendant disputes this number and contends it was erroneously extracted from one page of an 18 page report. (Dkt. No. 34, Am. Decl. Moore ¶ 6). Defendant states that true sales number for 2008 for Plaintiff's sales territory is $1,737,050.10. (Am. Decl. Moore ¶ 5).

Plaintiff also explains that his understanding of the Bonus Structure was that it was "a cumulative bonus schedule." (Kolpacke Dep. 110-111, 115). Plaintiff testified that Moore explained that the bonus structure was cumulative. (Kolpacke Dep. 110-111, 116-117). Also, Moore stated that the bonus was an annual bonus and that Defendant had never given a cumulative bonus to an employee. (Moore Decl. ¶¶ 6, 14).

Plaintiff contends that he is due a $10,000 bonus for 2009 because he raised his sales more than $1,500,000.00.[5] (*See* Ex. 10, Second Bonus Document). Because Plaintiff believes the bonus structure to be "cumulative" he argues that to calculate his 2010 bonus, his 2009 and 2010 sales figures must be added together. (*Id*. 109). Therefore, Plaintiff states he is owed a

---

[5] $1,888,706.21 [2009 sales figures] - $215,988.90 [2008 baseline sales figure] = $1,672,717.31

6

$65,500 bonus for 2010 because he raised his sales more than $3,500,000.[6] (Kolpacke Dep. Ex. 10, Second Bonus Structure Document). Finally, Plaintiff testified that he is entitled to a $134,748 bonus from 2011 because his aggregate sales amount from 2009 through 2011 less the 2008 baseline was $6,436,802.34.[7] (Def.'s Br. Ex. A, Pl.'s Resp. Disc. Req. ¶ 2). Although the Bonus Structure did not supply a rate for a bonus this high, Plaintiff calculated a bonus of $11,562 for each additional $500,000.00 of sales. (*Id*.).

Plaintiff testified that he inquired about Defendant's failure to pay him his 2009 bonus but could not remember how or when that occurred. (Kolpacke Dep. 103). Plaintiff also testified that he inquired why he was not paid a bonus for 2010 in the fall of 2011 and in an email from December 2011. (Kolpacke Dep. 119-120; Kolpacke Dep. Ex. 13, email inquiring regarding bonus). In response to that email, on January 5, 2012, Moore sent Plaintiff an email indicating that the baseline for earning addition income was $2,800,000. (Kolpacke Dep. Ex. 14). Plaintiff testified that his thoughts at the time were "dude, WTF what is this?" (Kolpacke Dep. 133). Plaintiff did not recall replying to this email or asking where that baseline number came from. (*Id*. 133-34). Defendant did give Plaintiff a discretionary bonus in January 2012 of $5,000 that was unrelated to his sale figures. (Kolpacke Dep. 126; Moore Decl. ¶ 17).

Moore testified no sale representative employed by Defendant since 2008 has ever received a bonus under the Bonus Structure because none had ever "hit their numbers." (Pl.'s Br. Moore Dep. 136).

---

[6] $1,980,607.45 [2010 sales figures] + $1,888,706.21 [2009 sales figures] - $215,988.90 [2008 baseline sales figure] = $3,653,324.86

[7] $6,652,802.34 [total sales from 2009 through 2011] - $215,988.90 [2008 baseline sales figure] = $6,436,802.34.

E.     Termination

On July 18, 2012, Moore provided Plaintiff with a termination notice stating that his employment was terminated immediately. (Pl.'s Br. Ex. K). The notice stated that Plaintiff would be "compensated for the next thirty days as [per] our agreement." (Ex. K). Moore testified that this letter was referring to the SRA. (Moore Dep. 77). Then Plaintiff received a termination notice by certified mail dated July 24, 2012 which stated that Defendant expected "compliance with the Sales Representative Agreement entered into when you commenced employment." (Pl.'s Ex. L; Ex. 11, SRA). Thereafter, Plaintiff started his own independent sales representative firm and notified past customers of this change. On August 6, 2012, Plaintiff received another letter from Defendant's attorney demanding compliance with the non-compete terms of the SRA. (Pl.'s Br. Ex. M; Ex. 11, §15).

## II. LEGAL STANDARD

The Defendant has moved for summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure. This rule provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Matsushita Electric Industrial Co., Ltd., et al. v. Zenith Radio Corp., et al.*, 475 U.S. 547, 587 (1986). Once this burden is met, the opposing party must produce some facts showing there is a genuine issue for trial. *Id*. If a rational trier of fact could not, based on the record as a whole, find in favor of the party opposing summary judgment, then summary judgment is granted in favor of the moving party. *Id*. The Court must view the facts and draw

all reasonable inferences in favor of the non-moving party. The Court does not determine if all of the evidence favors one side or the other, but "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### III. ANALYSIS

It is unclear from Plaintiff's briefing exactly what agreement Plaintiff is alleging Defendant breached. Plaintiff asserts in his Complaint that Defendant failed to pay him according to the parties' "agreement" but does not specify a particular document or contract. (Compl. ¶ 8). In his Response brief, Plaintiff first argues that the original employment agreement and Bonus Structure constituted a unilateral contract for which Plaintiff relies upon Michigan law. Plaintiff then argues that the parties mutually agreed to amend that original agreement based on the Second Bonus Structure (which set forth the same bonus structure but different salary) and the SRA. Then relying upon Indiana law (as required by the choice of law provision in the SRA), Plaintiff argues that the SRA is enforceable against Defendant and that there is ambiguity regarding the "commission" provision and Second Bonus document. (Ex. 11, ¶ 6). Plaintiff also alleges that Defendant breached the termination clause in the SRA by failing to give 30 days notice. (Ex. 11, ¶ 11).

**A.      Sales Representative Agreement**

In an attempt to determine what agreement existed, if any existed at all, the Court begins its analysis at the SRA. This document memorialized a change in Plaintiff's employment status, and both parties agree that the business relationship changed when Plaintiff became an independent contractor. At the time Plaintiff became an independent contractor, Defendant sent

Plaintiff the SRA which he signed and returned. Defendant now argues that the SRA is not binding because Defendant did not sign the SRA.

The SRA clearly sets forth a choice of law provision that provides that "[t]his agreement and any amendments shall be governed by and construed in accordance with the laws of the State of Indiana." (Ex. 11, ¶17). Therefore, the Court must look to Indiana law to interpret the SRA. Under Indiana law, courts must interpret contracts to ascertain and effectuate the intent of the parties "as reasonably manifested by the language of the agreement." *Reuille v. E.E. Brandenberger Const.*, 888 N.E.2d 770, 771 (Ind. 2008) (citation omitted). "'[I]f the language is clear and unambiguous, it must be given its plain and ordinary meaning.'" *Id*. (quoting *Cabanaw v. Cabanaw*, 648 N.E.2d 694, 697 (Ind. Ct. App. 1995)). Further, when the language of the contract is unambiguous, a court must look to the four corners of the document to give effect to the parties' intent. *Moore v. Wells Fargo Const.*, 903 N.E.2d 525, 531 (Ind. Ct. App. 2009) (citation omitted). "The meaning of a contract is to be determined from an examination of all of its provisions, not from a consideration of individual words, phrases, or even paragraphs read alone." *Id*. "[W]hen the language in a contract is ambiguous or uncertain, its meaning is to be determined by the consideration of extrinsic evidence. A contract is ambiguous only where a reasonable person could find its terms susceptible to more than one interpretation." *Haub v. Eldridge*, 981 N.E.2d 96, 101-02 (Ind. Ct. App. 2012) (citation omitted). When the language of a contract is ambiguous, "it is the responsibility of the trier-of-fact to ascertain the facts necessary to construe the contract." *Warrick Cnt'y ex. rel. Conner v. Hill*, 973 N.E.2d 1138, 1144 (Ind. Ct. Ap. 2012). A court should harmonize a contract's provisions and "avoid rendering any words, phrases, or terms ineffective or meaningless." *Haub*, 981 N.E.2d at 101-02

10

(citations omitted). "In Indiana, a meeting of the minds is an essential element of to the formation of a valid contract." *Members v. Hanks*, 206 Fed. Appx. 586, 588 (7th Cir. 2006) (citing *Fox Dev., Inc. v. England*, 837 N.E.2d 161, 165 (Ind. Ct. App. 2005)).

Defendant's argument that the SRA is not binding because the document is unsigned is unpersuasive. In *Nationwide Ins. Co. v. Heck*, 873 N.E.2d 190, (Ind. Ct. App. 2007), an Indiana Court held "the validity of a contract is not dependent upon the signature of the parties, unless such is made a condition of the agreement. However, some form of assent to the terms in necessary. Assent may be expressed by acts which manifest acceptance." *Id*. at 196 (citations omitted).[8] In *Heck*, the plaintiff sent the defendant a letter memorializing the terms of their agreement including the acknowledgment that defendant admitted liability. *Id*. The court noted that although the insurance company defendant denied the validity of the agreement because it did not sign the document, "the conduct of its agent, Niles over the course of twenty-eight months demonstrates, as a matter of law, that there was such an agreement." *Id*.

Looking at the record in the light most favorable to Plaintiff, Plaintiff testified he signed the SRA, drafted by Defendant, and mailed his signed copy to Defendant. (Kolpacke Dep. at 81-

---

[8] The Court notes a recent case decided by the Michigan Court of Appeals tracks a similar conclusion. In *Novodai, Inc. v. Pro-Cam Serv*., No. 310000, 2013 WL 3835959 (Mich. Ct. App. Jul. 25, 2013) the Michigan Court of Appeals found that a mutual release of claims was valid despite the plaintiff's failure to sign the document because there was an offer, plaintiff agreed to the release, and there was mutual assent to all the essential terms and "[t]he parties thereafter completed the required performances under the mutual release." *Id*. at *7. The court noted that a "meeting of the minds can be found from performance and acquiesce in that performance." *Id*. at *7 (citing *Sanchez v. Eagle Alloy, Inc*., 245 Mich. App. 651, 666 (2003)). The Sixth Circuit also decided a somewhat analogous case applying Michigan law in which held that an employee can be held to a binding arbitration agreement even if that employee does not sign the agreement. *Tillman v. Macy's Inc*., 735 F.3d 453 (6th Cir. 2013). In *Tillman*, the Sixth Circuit noted that, the plaintiff accepted an offer through her actions: "Tillman's conduct following the communication of the offer objectively suggests that she accepted the arbitration agreement by continuing her employment without returning an opt-out form." *Id*. at 460.

83; Ex. 11). It is undisputed that Plaintiff performed as an independent contractor for Defendant and was paid by Defendant for approximately three years after signing the contract. Moore testified that it was his practice not to sign SRAs and that he had SRAs with each sales representative. (Pl.'s Br. Ex. B, Moore Dep. 116-117). Further, and perhaps most persuasive, is the fact that Defendant attempted to enforce provisions of the SRA against Plaintiff and also reminded Plaintiff to comply with the SRA when he was terminated. Indeed, the certified letter delivered to Plaintiff from Defendant's attorney states, "I am enclosing a copy of the Termination of Employment letter that was given personally to you July 18, 2012. <u>We expect compliance with the termination and compliance with the Sales Representative Agreement entered into when you commenced employment</u>." (Pl.'s Ex. L) (emphasis added).

Therefore, looking at the record in a light most favorable to Plaintiff, the Court finds that there is clear evidence that Defendant acquiesced to the terms of the SRA through its conduct both by paying and accepting Plaintiff's services as an independent contractor as well as attempting to enforce the agreement after terminating Plaintiff.

**B. Breach of SRA**

In finding that the SRA is a binding contract, the Court must next evaluate whether there are any genuine issues of material fact as to whether Defendant breached this contract.

### 1. Termination Agreement

First, Plaintiff alleges Defendant breached the SRA's termination agreement. Paragraph 11 states:

> This agreement may be terminated by either mutual agreement of the parties or by written notice of either of the parties to the other party of an intention to terminate the agreement. Any such written notice shall serve automatically to terminate this agreement 30 days after such notice is sent to the other party via certified or

registered mail.

(Ex. 11, SRA ¶ 11). On July 18, 2012, Defendant sent Plaintiff a letter notifying him of his immediate termination and stating that he would be "compensated for the next 30 days pursuant as [sic] our agreement." (Pl.'s Ex. K). Thereafter, on July 24, 2012, Defendant sent Plaintiff another copy of his termination letter through his attorney by certified mail. (Pl.'s Ex. L). Plaintiff alleges Defendant's failure to give 30 days notice and its failure to pay Plaintiff his last two salary payments is a breach of the SRA. Defendant does not directly address this claim other than its argument that the SRA was not binding and to acknowledge that this issue is not the main thrust of Plaintiff's claims. The Court finds that Plaintiff has set forth enough facts to establish that there is a genuine issue of material fact as to whether Defendant breached the SRA's termination provision.

    **2.    Bonus Structure**

The real meat of this contract dispute is not regarding the termination provision of the SRA, but whether Defendant breached an agreement regarding the bonuses. Defendant argues that the Bonus Structure is a separate agreement from the SRA and the two cannot be conflated together because they do not refer to each other. Further, Defendant argues that the Bonus Structure was given to Plaintiff six months before the SRA. Plaintiff does not directly address whether the two documents are one agreement or if the Second Bonus Document is a separate agreement. Rather, Plaintiff conflates the two documents together without any reasoning or explanation.

Defendant argues that the Bonus Structure document was given to Plaintiff some six months before the SRA, however, Plaintiff testified that he received the Second Bonus

Document which listed a different salary but contained the same bonus language and "Appendix A" language with a recitation of Plaintiff's territory. (Kolpacke Dep. 74-75). Further, Plaintiff testified that he received the SRA and the Second Bonus Document from Defendant at approximately the same time. (Kolpacke Dep. 74-75, 78-80, testifying that he received both documents sometime between June 26, 2009 and August 2009).[9]

Defendant also argues that the two documents do not refer to one another and therefore cannot be read as one agreement. Under Indiana law,

> [o]ther writings, or matters contained therein, which are referred to in a written contract may be regarded as incorporate by reference as a part of the contract and, therefore, may be considered in the construction of the contract. Where a written contract refers to another instrument and makes the terms and conditions of such other instrument a part of it, the two will be construed together as the agreement of the parties. However, if in a written contract, a reference is made to another writing for a particularly designated purpose, the other writing becomes a part of the contract only for the purpose specified, and is foreign to the contract for all purposes other than the one specified.

*I.C.C. Protective Coatings, Inc. v. A.E. Staley Mfg. Co.*, 695 N.E.2d 1030, 1036 (Ind. Ct. App. 1998) (internal citations omitted); *see also MPACT Const. Grp. LLC v. Superior Concrete Constr.*, 785 N.E.2d 632, 639 (Ind. Ct. App. 2003). In *A.E. Staley*, the plaintiff argued that a right to cure provision in a letter and bid were incorporated into the parties' agreement through language in a purchase order. *A.E. Staley*, 695 N.E.2d at 1036. However, the Indiana Court of

---

[9] Moore testified that he could not be certain which "appendix" document (Bonus Structure document) he sent to Plaintiff - the one that Plaintiff testified he received (Ex. 10) or the "standard" one provided in discovery by Moore (Moore Dep Ex. 1). Interestingly, the standard SRA document provided by Moore in discovery actually labeled the salary section "Appendix B" and included a paragraph in the standard SRA which stated "Appendix B May Indicate Salary, Expenses and Bonus Program instead of Commission program. When on Salary the notice of termination final check will be based on Salary not Commission. Will be specified in Appendix B." (*See* Moore Dep. Ex. 1, SRA and Appendix). The documents Plaintiff produced do not included any references to Appendix B.

14

Appeals held that because the purchase order only referred to certain sections of the bid and letter the disputed right to cure provision was not incorporated. *Id*.

In the current action, the SRA specifically refers to the Second Bonus Document. Paragraph 2 of the SRA, "Sales Territory", sets forth: "[r]epresentative shall have the right to offer for sale and to sell products, through company, to customers as set forth on the attached Appendix A." (Ex. 11, 2). The Second Bonus Structure Document contains the phrase "Appendix A" and then lists Plaintiff's territory. Therefore, the documents do in some way refer to one another. The documents both came from Defendant around the same time, in preparation for Plaintiff's transition to independent contractor, and there is no dispute that the bonus structure set forth was the one that the parties agree was in effect. However, similar to the *A.E. Staley* case, the SRA only references Appendix A. The SRA does not in any way reference a bonus structure or schedule. In fact, the SRA only contemplates "commissions" and does not use the word "bonus".[10] (*See* Ex. 10, §6, "Commissions"). Therefore, under Indiana law, the Court finds that where the contract specifically references and incorporates only one provision (Appendix A) of the Second Bonus Document the rest of the document cannot be incorporated simply by its location on the same page. Therefore, the rest of the Second Bonus Document,

---

[10] Plaintiff appears to argue that the "Commissions" provision of the SRA refers to bonus compensation. However, this section only refers to "commissions" not a bonus. Further this section refers to an Appendix B which does not exist and also states that commissions were to be paid on a bi-monthly basis. (Ex. 10, §6, "Commissions"). Plaintiff testified that he never received a bi-monthly payment of bonuses. (Kolpacke Dep. 103). Plaintiff does not explain or address the issue of commission versus bonus and merely conflates the two in his briefing. Further, neither party has contended that Plaintiff was ever entitled to "commissions" - indeed Plaintiff abandoned a claim under the Sales Representative Commission Act. (*See* Dkt. 8, Aff. Def. 2). Therefore, to the extent Plaintiff attempts to argue that a "commission" and a "bonus" are the same such an argument is without merit where there is nothing in the record reflecting that the two terms were interchangeable.

specifically the bonus structure language and schedule, is "foreign" to the agreement and cannot be read together with the SRA.

**C.     Bonus Agreement as Separate Agreement**

In finding that the Bonus Structure language on the Second Bonus Document is separate from the SRA, the Court notes that Indiana law is no longer applicable. The document does not include a choice of law provision or any other indication that it must be reviewed under Indiana law. Therefore, Michigan law applies to the Court's evaluation of the existence of a bonus agreement and the Second Bonus Document.

Both parties agree that the bonus language in the Second Bonus Document (which contains identical language as the first Bonus Structure document) set forth the agreement between the parties regarding bonus awards. However, both parties completely disagree about what the limited language means and the fundamental terms of the agreement (the baseline for sales and whether the bonus was annual or cumulative). Defendant argues that because there was no "meeting of the minds" regarding these terms no valid contract exists.

Plaintiff contends that the Court should find that the Second Bonus Document is a contract but that the language is ambiguous, and therefore, the Court should turn to extrinsic evidence to interpret it. Specifically, Plaintiff argues that the language "Bonus on Sales Increases / Over existing Business in / Territory assigned of 2006" is ambiguous. (Ex. 10). Plaintiff contends this sentence could be read to mean that the bonus was awarded based on a the 2006 sales figure *or* the bonus was awarded based on the current sales figure derived from the territory as assigned in 2006. Plaintiff contends that the extrinsic evidence gives rise to a genuine issue of fact regarding whether the 2008 sales figure should be the baseline figure and

whether the schedule is annual or cumulative. Further, Plaintiff argues that the Second Bonus Document is ambiguous as to the whether it is an annual structure or cumulative, because the language merely provides that "the bonuses continue as sales increase".[11] (Ex. 10).

Under Michigan law, the primary goal when interpreting a contract is to give effect to the intent of the parties. *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 127 n. 28 (1994); *Old Kent Bank v. Sobczak*, 243 Mich. App. 57, 63-64 (2000). Further, to establish a contract exists, there must have been a "meeting of the minds" or mutual assent to all material facts. *Kamalnath v. Mercy Mem. Hospital Corp.*, 194 Mich. App. 543, 548 (Mich. Ct. App. 1992). "A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Id.* (citation omitted). It is the plaintiff's burden to prove the contract to be enforced exists. *Id.* at 549.

The Court finds that there was no meeting of the minds between the parties regarding a bonus agreement. Plaintiff's argument that the Court should find the language in the Second Bonus Document ambiguous and examine extrinsic evidence misses the larger issue at hand: the document itself is missing critical essential elements such that the Court cannot find that a binding contract regarding a bonus agreement exists.[12]

Under Michigan law, where a contract contains essential terms, but the details regarding

---

[11] Plaintiff looks again to the SRA to attempt to support its arguments, however, as examined previously the SRA does not refer to any bonus but rather commissions.

[12] The Court also notes that Plaintiff's extrinsic evidence also does not help his case as there is nothing in the record that supports his belief that the baseline amount was 2008s sales figures beyond his own subjective belief. Further, Plaintiff's belief that the bonus structure was to be cumulative was based on an alleged conversation with Moore that Plaintiff could not remember. (Kolpacke Dep. 118). Therefore, even if the Court were to follow Plaintiff down this rabbit hole and evaluate extrinsic evidence, such evidence does not give rise to a genuine issue of material fact regarding the baseline amount and whether the bonus structure was cumulative.

performance are missing, "the law will supply the missing details by construction." *First Pub. Corp. v. Parfet*, 246 Mich. App. 182, 189 (2001), *vacated in part on other grounds*, 468 Mich. 101 (2003). When the certain terms like time for payment or performance are missing, a court can presume reasonable terms unless the parties have expressed a contrary contention. *Kojaian v. Ernst*, 177 Mich. App. 727, 731 (2007); *see also Redinger v. Standard Oil Co.*, 6 Mich. App. 74, 79-80 (1967) (supplying an unspecified lease term when there was uncontradicted evidence regarding the term in the record.)).

In the present case, Plaintiff cannot show that there was ever any agreement between the parties regarding the baseline amount for determining the bonus amount or the structure of the bonuses (annual versus cumulative). Further, there is no evidence in the record that there was ever any meeting of the minds regarding these terms as Plaintiff argues that he believed the 2008 figure was the baseline amount during the very first conversation with Moore.

In an unpublished Michigan Court of Appeals case, the court found a plaintiff failed to evidence mutuality of agreement as to the length of an employment contract where the plaintiff's own testimony indicated he "did not have an understanding of the essential terms [length of the contract] of the agreement." *Kozma v. Chelsea Lumber Co.*, 2010 WL 2836327, at *2 (Mich. App. July, 20 2010). The court went on to find that this was not fatal to the contract as a whole because the length of a contract (and the matter of terminating a contract) are terms that could be judicially constructed. *Id.* at *3.

Here, unlike *Kozma*, the terms which are missing from the parties' agreement concern the actual structure of the bonus - not just the length of the agreement or type of payment. These terms are so essential that without them there can be no valid contract. Additionally, similar to

*Kozma*, Plaintiff's own testimony evidences the fact that he did not know what the essential terms of the contract were. (*See* Kolpacke Dep. 91-92 (not recalling what the baseline number was); 112 (testifying it was his belief that the baseline number was 2008s sales figures); 118 (testifying that he could not remember what Moore said when he explained the bonus was cumulative.). Finally, the Court notes that Plaintiff continued to work for Defendant for three years despite never being paid a bonus under his interpretation of the agreement. *See Schroeder v. Terra Energy, Ltd.*, 223 Mich. App. 176, 191 (1997) (noting that generally a parties course of performance is high persuasive of contract terms). Given these circumstances the Court finds that Plaintiff cannot carry his burden and show that a contract regarding bonuses ever existed.

## IV. CONCLUSION

For these reasons, the Court GRANTS IN PART (to the extent that no valid contract regarding bonuses exists) and DENIES IN PART (to the extent Plaintiff asserts a viable breach of contract based on the termination clause of the SRA) Defendant's Motion for Summary Judgment.

**IT IS SO ORDERED.**

                                              s/Paul D. Borman
                                              PAUL D. BORMAN
                                              UNITED STATES DISTRICT JUDGE

Dated: December 12, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 12, 2013.

                                        s/Deborah Tofil  
                                        Case Manager